**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ELECTROSTIM MEDICAL**
**SERVICES, INC.,**

        **Plaintiff,**

v.                           **Case No. 8:11-cv-2467-T-33TBM**

**DAWN LINDSEY and ZYNEX**
**MEDICAL, INC.,**

        **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court for a Report and Recommendation on **Plaintiff Electrostim Medical Services, Inc.'s Motion for Preliminary Injunction and Supporting Memorandum of Law** (Doc. 18), Lindsey's Memorandum in Opposition to EMSI's Motion for Preliminary Injunction (Doc. 32), Defendant Zynex Medical Inc.'s Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and Joinder in Lindsey's Opposition to Motion for Preliminary Injunction (Doc. 35), and Plaintiff's Reply Memorandum (Doc. 46).[1] Oral argument on the motion for preliminary injunction was conducted February 9, 2012. For the reasons that follow, I recommend Plaintiff's motion be granted.

---

[1]Additionally, the parties filed declarations, exhibits, and other documents in support of their respective positions. *See* (Docs. 19, 50, 52, 58, 63, 64, 69); (Pl. Ex. 1-22); (Def. Ex. 1-3).

I.

A.

Plaintiff, Electrostim Medical Services, Inc. (EMSI) initiated this lawsuit against Defendants, Dawn Lindsey (Lindsey) and Zynex Medical, Inc. (Zynex), in the circuit court in Hillsborough County, Florida, on September 8, 2011.  On October 28, 2011, Defendants removed the case to this court on the basis of diversity of citizenship.  EMSI is a resident of Florida; Lindsey is a resident of Texas; and Zynex is a resident of Colorado.  By its Amended Complaint, EMSI asserts causes of action for breach of contract against Lindsey (Count I), tortious interference against Zynex (Count II), and unjust enrichment against Zynex (Count III).[2]

By its motion for preliminary injunction (Doc. 18), EMSI seeks an injunction barring Lindsey from employment with Zynex or any other competitor in the Dallas/Fort Worth, Texas market; barring Zynex from employing Lindsey in that market; enjoining Lindsey from soliciting EMSI customers as identified in the Wilkinson affidavit (Doc. 18-2); and barring both Defendants from using EMSI's confidential information.

EMSI urges that such relief is appropriate against Lindsey due to her breach of her employment agreement (the Agreement) with EMSI by accepting and continuing employment with EMSI's competitor Zynex, because of her solicitation of EMSI's customers, and because she has and will divulge EMSI's confidential and proprietary information.  As for Zynex, the claim for injunctive relief is based on its alleged tortious interference with the Agreement by

---

[2]Plaintiff does not seek injunctive relief in connection with Count III.  (Doc. 14 at 9).

hiring Lindsey and continuing to employ her despite being aware of the Agreement.  EMSI alleges that the Defendants' conduct has jeopardized its relationships with its customers, and absent an injunction, these relationships will be irreparably harmed.

B.

Certain facts pertinent to this motion appear undisputed.  EMSI and Zynex are direct competitors in that both design and sell non-invasive medical products for the use of pain control and physical rehabilitation (commonly referred to as TENS units).  Lindsey was employed with EMSI from approximately July 2004 until May 2011.  She had no experience in the medical device industry prior to working for EMSI.  She was hired by EMSI as a sales representative to develop the Fort Worth, Texas market.  She was eventually promoted to EMSI's Area Manager for the entire Dallas/Fort Worth market.  In April 2011, Lindsey advised EMSI that she was resigning, ostensibly to go to work for a bone growth company. By EMSI's account, during a period after she had announced her resignation but prior to her last date of employment, Lindsey changed her voice mail to advise customers that were faxing prescriptions to send the requests to her at a non-EMSI number.  At some point in July 2011, EMSI learned that Lindsey was working for its competitor Zynex.

At the beginning of her employment with EMSI, Lindsey executed an employment agreement (the Agreement) that contained several restrictive covenants.  By the Agreement, Lindsey agreed not to compete with EMSI during and for a period of twenty-four months following her employment with EMSI:

> Employee's Agreement not to Compete with Employer.  Employee recognizes and acknowledges that it is essential for the proper protection of the Employer's

legitimate interests that Employee be restrained for a reasonable period following the termination of Employee's employment with the Employer, either voluntarily or involuntarily, from competing with Employer as set forth below.

Employee acknowledges and agrees that during the term of his or her employment with Employer, and for a period of twenty-four (24) months thereafter, Employee will not, directly or indirectly, engage, participate or invest in or be employed by any business within the Restricted Area, as defined below, which: (i) develops, manufactures, designs, engineers, integrates and/or sells products which are competitive with or similar to products developed or manufactured by Employer; (ii) distributes, markets or otherwise sells, either through a direct sales force or through the use of the Internet, products manufactured by others which are competitive with or similar to products distributed, marketed or sold by Employer; or (iii) provides services, including the use of the Internet to sell, market or distribute products, which are competitive with or similar to services provided by Employer, including, in each case, any products or services Employer has under development or which are the subject of active planning at any time during the terms of Employee's employment. The foregoing restrictions shall apply regardless of the capacity in which Employee engages, participates or invests in or is employed by a given business, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise.

> "Restricted Area" shall mean each state and territory of the United States of America in which Employer has developed, marketed, sold and/or distributed its products and/or services within the last two (2) years of Employee's employment.

(Doc. 18-1 at 5). The Agreement also contained a provision regarding the solicitation of customers or clients of EMSI:

> Non-Solicitation Agreement. During the term of Employee's employment with Employer and for a period of twenty-four (24) months after termination of the Employee's employment with the Employer for any reason, Employee will not: (i) employ, hire, solicit, induce or identify for employment or attempt to employ, hire, solicit, induce or identify for employment, directly or indirectly, any employee(s) of the Employer to leave his or her employment and become an employee, consultant or representative of any other entity including, but not limited to, Employee's new employer, if any; and/or (ii) solicit, aid in or encourage the solicitation of, contract with, aid in or encourage the contracting with,

4

> service, or contact any person or entity which is or was,
> within the two (2) years prior to Employee's termination of
> employment with Employer, a customer or client of
> Employer, for purposes of marketing, offering or selling a
> product or service competitive with Employer.

(Doc. 18-1 at 5).

Additionally, the Agreement addressed the confidentiality of proprietary information

obtained at EMSI:

> At all times, both during Employee's employment with
> Employer, and after the termination or expiration of
> Employee's employment, whether voluntarily or
> involuntarily, Employee acknowledges and agrees to keep in
> confidence and trust all such Proprietary and Confidential
> Information and agrees not to use or disclose any such
> Proprietary and Confidential Information without the written
> consent of Employer, except as may be necessary in the
> ordinary course of performing his or her duties to the
> Employer.

*Id.* at 3. Furthermore, the Agreement required Lindsey to inform each new employer about

the agreement she signed with EMSI prior to accepting employment, for a 24-month period

immediately following the end of her employment with EMSI:

> Agreement to Inform Subsequent Employers. For the period
> of twenty-four (24) months immediately following the end of
> his or her employment by Employer, Employee will inform
> each new employer, prior to accepting employment, of the
> existence of this Agreement and provide that employer with
> a copy of this Agreement.

*Id.*

In further support of its allegations that Lindsey breached the Agreement and Zynex

tortiously interfered with the Agreement, EMSI proffered a number of exhibits at the hearing.

5

*See* Pl. Ex. 1-22. These exhibits fairly well establish that Lindsey was actively engaged in employment discussions with Zynex while employed with EMSI and offered up her ability to bring substantial experience and contacts to Zynex. (Pl. Ex. 2, 4, 7-10). These exhibits further demonstrate that Lindsey went on the payroll and participated in training with Zynex while she was still an employee of EMSI. Thus, by her email of April 25, 2011, Lindsey's last date of employment with EMSI was May 6, 2011, and she continued to receive payment as an employee of EMSI through May 11, 2011. Payroll records for Zynex reflect Lindsey began receiving payment on April 27, 2011; Lindsey was sending prescriptions to Zynex starting April 25, 2011; and Lindsey was participating in training with Zynex in Colorado during the week of May 5, 2011. *See* Pl. Ex. 10-14. Furthermore, the exhibits demonstrate that Zynex was fully aware of Lindsey's non-compete obligations under her Agreement with EMSI and chose to hire Lindsey anyway. (Pl. Ex. 3-4). In order to insulate her from the financial consequences of a breach of her non-compete, Zynex agreed to indemnify her in the event of legal proceedings instituted by EMSI. (Pl. Ex. 5). Demands by EMSI's counsel that Defendants honor the non-compete agreement were ignored. (Pl. Ex. 18).

As addressed below, Defendants depend largely on legal arguments to urge that Plaintiff is not entitled to injunctive relief. Neither Defendant seriously disputes the factual allegations made by Plaintiff that Lindsey left EMSI and went to work for Zynex, a competitor.[3] Although Defendants acknowledge that Lindsey is selling competing products in

---

[3] By Lindsey's account, she left because of EMSI's policies related to acceptance of Medicare/Medicaid, Blue Cross/Blue Shield and HMO insurance, and a September 2009 policy change whereby EMSI began requiring preauthorization of customer insurance. According to her, these policies combined to effect a decline in Lindsey's sales and

the same market and calling on the same "referring sources" she formerly did business with while at EMSI, they deny she is soliciting or selling to any EMSI "customers" in violation of the non-compete. Lindsey also denies the allegations that she was privy to EMSI confidential information or that Defendants have used the same. Defendants further assert that after Lindsey left EMSI, the Defendants learned that the United States Food and Drug Administration (FDA) had conducted an investigation and issued a warning letter to EMSI during a period when she was still employed with EMSI. (Def. Ex. 2). EMSI never notified Lindsey of the warning letter or advised her to change her marketing or sales approach for its products. (Doc. 69). As a consequence of this, the Defendants further urge an unclean hands defense as a bar to the request for equitable relief on this motion.

II.

A.

As noted above, the Defendants' arguments against the entry of injunctive relief are based almost entirely on legal rather than factual grounds. First, Defendants argue that the claims in this suit are governed by Texas law despite the choice of law provision in the Agreement, and under such law, an injunction would be inappropriate. Next they urge that whether governed by Florida law or Texas law, the restrictive covenants are unenforceable

---

commissions in the Dallas/Fort Worth market. Defendants proffer a summary of Lindsey's average monthly sales from October 2009 to April 2011 to support the claim that the preauthorization policy negatively impacted her earnings. (Def. Ex. 1). This is countered by Plaintiff who proffers evidence that Lindsey's income actually went up during this time frame. (Pl. Ex. 22).

because Plaintiff cannot demonstrate a legitimate business interest meriting the relief requested.

As for the applicable law, a federal district court sitting in diversity must apply the choice of law rules of the forum state, in this case Florida. *See Acme Circus Operating Co. v. Kuperstock,* 711 F.2d 1538, 1540 (11th Cir. 1983).[4]  Under Florida law, the rights of parties to stipulate to a choice of law provision in a contract are generally recognized. *See, e.g.,* Fla. Stat. § 671.105(1).[5]  "This [Uniform Commercial Code] provision is consistent with Florida's traditional non-U.C.C. choice of law principles on 'party autonomy.' . . . Thus, the parties' contractual decision to litigate their contractual disputes in Florida under Florida law should be respected and enforced, particularly when, as in this case, the parties are sophisticated commercial entities that entered into the contract following arms length dealings." *Merriman v. Convergent Bus. Sys., Inc.*, No. 90-30138-LAC, 1993 WL 989418, at *4 (N.D. Fla. June 23, 1993) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1069-70 (11th Cir. 1987)).

---

[4]"The first step in choice of law analysis is to ascertain the nature of the problem involved, i.e. is the specific issue at hand a problem of the law of contracts, torts, property, etc. The second step is to determine what choice of law rule the state of [Florida] applies to that type of legal issue. The third step is to apply the proper choice of law rule to the instant facts and thereby conclude which state's substantive law applies." *Acme Circus*, 711 F.2d at 1540.

[5]In pertinent part, the U.C.C. provides: "when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation will govern their rights and duties. . . ." Fla. Stat. § 671.105(1) (2002).

Here, the Agreement contains a forum selection clause whereby EMSI and Lindsey

agreed that Florida law applies to any disputes under the Agreement. Specifically, the

Agreement's choice of law provision provides:

> Employer and Employee acknowledge and agree that this
> Agreement shall be interpreted, governed by and construed in
> accordance with the laws of the State of Florida. . . .
> Employer and Employee irrevocably agree to submit to the
> jurisdiction of the courts of Hillsborough County, Florida
> and irrevocably waive any objection which either may have
> to the same.

(Doc. 18-1 at 7). And, "[g]enerally, Florida enforces choice-of-law provisions unless the law

of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. DuPont*

*De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). The party seeking to invalidate a

choice-of-law provision as violating strong public policy bears the burden of proof. *Id.*

Despite this choice-of-law provision, Defendants argue that Texas law is controlling

essentially because it is the state with the greatest interest in the dispute. Citing the

Restatement (Second) of Conflict of Laws, Zynex urges that a state need not honor the parties'

choice of law under an agreement where "(a) the chosen state has no substantial relationship

to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a

state which has a materially greater interest than the chosen state . . . ." RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 187(2) (1971). Because EMSI transacts business in Texas,

Lindsey lives in Texas, Lindsey performed her employment duties in Texas, and the

consumers of the services and products are located in Texas, Defendants urge the weighing of

interests favors application of Texas law where Florida's only connection is that EMSI has its principal place of business in Florida and Lindsey visited EMSI's Florida headquarters one time per year. Thus, Defendants contend that while Lindsey has not purposefully availed herself of the resources of the state of Florida, EMSI clearly avails itself of the opportunities to conduct business in Texas. Also relying upon the Texas Supreme Court's decision in *DeSantis v. Wackenhut*, 793 S.W.2d 670 (Tex. 1990), Defendants urge that the law governing enforcement of noncompetition agreements is a fundamental policy of Texas and to apply the law of a different state to determine the enforceability of those agreements is contrary to Texas' public policy.[6] (Doc. 35 at 9).

Here, if the matter turned solely on a consideration of the substantial relationships of Texas versus Florida to the litigants in the suit, then Defendants' position might prevail. However, unlike Texas, Florida does not follow the Restatement's "substantial relationships test" on issues related to choice of law in a breach of contract claim. *See Sturiano v. Brooks*, 523 So. 2d 1126, 1128-30 (Fla. 1988) (declining to adopt "significant relationship test" found in § 188 of the Restatement (Second) of Conflict of Laws and noting that the "[p]arties have a right to know what the agreement they have executed provides."). Notwithstanding, courts within Florida and this circuit have recognized that the strong public policy of a state with a relationship to the transaction can override the parties' choice of applicable law in some cases.

---

[6]The court notes the Texas Supreme Court's recent opinion in *Marsh USA Inc. v. Cook*, 354 S.W.2d 764, 772-73 (Tex. 2011), discusses the enactment of § 15.50(a) of the Texas Business and Commerce Code which intended to restore the prior common law rule that noncompetition clauses in contracts pertaining to employment were not normally considered to be contrary to public policy as an invalid restraint of trade.

*See Merriman,* 1993 WL 989418, at *5. However, under the circumstances of this case, I find

no such basis to invalidate the parties' choice of law agreement. As stated by the court in

*Merriman*, "Florida has as much interest in enforcing the contractual choice of law made by

the parties for the benefit of a Florida business as Texas has in making such a provision

voidable for the benefit of a Texas business." *Id.* Clearly as between EMSI and Lindsey, she

makes no showing that enforcement of this provision violates the public policy of Florida and

I find no good cause to avoid this provision of the Agreement.

In contrast, Florida courts have adopted the Restatement's "significant relationships

test" to resolve choice of law issues in tort claims. *See Bishop v. Fla. Specialty Paint Co.*, 389

So. 2d 999, 1001 (Fla. 1980). Thus, for purposes of analyzing the Plaintiff's substantial

likelihood to succeed on the merits of its tortious interference claim against Zynex, Texas law

arguably applies. In that regard, courts have recognized that in certain circumstances,

"different substantive issues in a single case may have to be resolved under the laws of

different states where the choices influencing decisions differ." *Shapiro v. Assoc. Int'l Ins.*

*Co.*, 899 F.2d 1116, 1119 (11th Cir. 1990) (quoting *Foster v. United States*, 768 F.2d 1278,

1281 (11th Cir. 1985)). Section 145 of the Restatement (Second) of Conflict of Laws

provides, in pertinent part:

> (1) The rights and liabilities of the parties with respect to an issue in tort are
> determined by the local law of the state which, with respect to that issue, has the
> most significant relationship to the occurrence and the parties under the principles
> stated in § 6.

> (2) Contacts to be taken into account in applying the principles of § 6 to determine
> the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). Applying the principles of § 145 of the Restatement to the instant facts, the place where the injury occurred is arguably in Florida. *See id.* at § 145 cmt. f ("the place of injury is less significant in the case of . . . such unfair competition as consists of false advertising and the misappropriation of trade values. The injury suffered through false advertising is the loss of customers or of trade. Such customers or trade will frequently be lost in two or more states. *The effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business.*") (emphasis added). The domicile or residence of the parties is a wash. However, the location of where the conduct causing the injury occurred as well as where the parties' relationship is centered would be in Texas. Thus, at this stage of the proceedings, the balance of interests appears to favor application of Texas law to the tortious interference claim. Be that as it may, as noted below, the elements that a plaintiff must establish in order to support a claim for tortious interference are similar under Texas and Florida law. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77-78 (Tex. 2000); *Tamiami Trail Tours, Inc. v. Cotton,* 463 So. 2d 1126 (Fla. 1985).

12

B.

Florida law provides that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. § 542.335(1)(b). Such "legitimate business interests" include: (1) trade secrets; (2) valuable confidential business or professional information that otherwise does not qualify as trade secrets; (3) substantial relationships with specific prospective or existing customers, patients, or clients; (4) customer, patient, or client goodwill associated with an ongoing business or professional practice, a specific geographic location, or a specific marketing or trade area; and (5) extraordinary or specialized training. *See id.*

Plaintiff identifies two legitimate business interests that it contends merit protection under Florida law. First, Plaintiff submits that its substantial relationships with specific prospective and existing customers constitute a legitimate business interest meriting protection. *See* Fla. Stat. § 542.335(1)(b)(3). Second, Plaintiff urges that its valuable confidential business and professional information are legitimate business interests that support the restrictive covenants contained in the Agreement. *See id.* at § 542.335(1)(b)(2). In response, Defendants contend that– whether under Florida law or Texas law– Plaintiff is unable to establish the requisite legitimate business interest to support its restrictive covenants. Specifically, Defendants argue that the physicians and clinics that Plaintiff claims are its "customers" are actually "referral sources" that are not considered legitimate protectable business interests. On the second business interest, Defendants contend that Plaintiff has failed to identify any information that is actually "confidential" or "valuable" of

which Lindsey knew while employed by Plaintiff other than the identity of referral sources

which Defendants again argue are not confidential.

Plaintiff cites numerous Florida cases that clearly recognize an employer's legitimate

business interest in prohibiting solicitation of its customers with whom it had a substantial

relationship.[7] (Doc. 18 at 10). By Plaintiff's contention, it is the doctors, therapists, and

clinics that are considered– in the industry– to be the customers, not the patients who

ultimately receive its products, and these clinicians are identified as such on its records.

Defendants argue that referral sources such as orthopedic surgeons, physical

therapists, and the like are not protectable business interests under Texas law.[8] While Lindsey

acknowledges that she still receives referrals from the sources she had while working at

EMSI, she urges that these referral sources are just that, and the customers are the end-users of

the products.[9] Thus, by her declaration, she describes customers as the individual patients

who use the TENS units and as for them, she has not solicited any such existing customer of

EMSI. (Doc. 52). By her further argument, EMSI does not have a legitimate business interest

in the entire Dallas/Fort Worth market and Florida case law does not support a legitimate

---

[7]Plaintiff cites *North American Products v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992); *International Hair & Beauty System, LLC v. Simply Organic, Inc.*, No. 8:11-cv-1883-T-30AEP, 2011 WL 5359264 (M.D. Fla. Sept. 26, 2011); and *America II Electronics, Inc. v. Smith*, 830 So. 2d 906, 907 (Fla. Dist. Ct. App. 2002).

[8]Zynex cites *Hunke v. Wilcox*, 815 S.W.2d 855, 857 (Tex. App. 1991).

[9]In support, Lindsey cites *Tummala*, 927 So. 2d 139. She acknowledges the *Torregrosa* opinion but urges that the discussion of referral sources in that opinion was dicta. (Doc. 32 at 10 n.2).

business interest in prospective customers.[10]  Because EMSI has failed to identify any specific prospective patient customer with whom Lindsey has interfered, she urges there is no basis for injunctive relief.[11]

In reply to Defendants' argument that its customers are the end-users of its products and the prescribing doctors or clinicians are mere referral sources, EMSI urges such is not the case practically or legally under Florida law.  Thus, it argues that in the durable medical goods industry, end-users may not secure the products absent a letter of medical necessity or prescription from a medical professional.  As a consequence, EMSI's territorial and area managers develop relationships with doctors, chiropractors, therapists, and other clinicians with patient populations that will benefit EMSI.  Once the relationship is established, EMSI products are placed in and stored at the clinician's office until it is prescribed to a patient.  The patient is not the one to choose the electrostimulation device used on them, but rather it is the clinician who prescribes it that does.  *See* (Doc. 50 at 1-2).  Thus, EMSI urges that these clinicians are, in effect, its retail outlets and occupy a wholly different relationship than the physician referrals from one physician to another.  While acknowledging a split of authority in Florida as to whether "referral sources," may be considered legitimate business interests for purposes of invoking injunctive relief, EMSI urges its relationships with its clinicians are closely akin to the circumstances addressed by the court in *Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 836 So.2d 415 (Fla. Dist. Ct. App. 2002).

_____

[10]Lindsey cites *University of Florida Board of Trustees v. Sanal*, 837 So. 2d 512 (Fla. Dist. Ct. App. 2003).

[11]*See GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327 (M.D. Fla. 2010).

By my consideration of the proffered evidence, the doctors, therapists, chiropractors and other clinicians who agree to place EMSI's products at their facilities for use with their patients are more than mere "referral sources" as urged by the Defendants. As EMSI contends, and as Lindsey herself acknowledges, EMSI developed relationships with these clinicians in the Dallas/Fort Worth market over a number of years through Lindsey's marketing efforts. For all practical purposes, these clinicians act as retailers through whom or which EMSI's TENS products are prescribed and distributed to end-users. While these relationships are not formalized by contract and, in the end, it is the patient or the patient's insurer who pays for the product, these clinicians appear the lifeblood of this business. Upon this record, it appears the industry practice is to cultivate relationships with the various doctors' or other clinicians' offices prescribing such products in an effort to establish a network through which products reach the end-users. Companies such as EMSI rely upon such clinicians to stock the product in something akin to a consignment relationship so that it will be prescribed to patients needing such device. Thus, the services provided by these clinicians go beyond a mere referral service. Here, EMSI developed these "customers or clients" in the Dallas/Fort Worth market over a period of years by building and servicing one relationship at a time. There is no indication that EMSI or other such medical device suppliers seek to or actively engage in selling or marketing to the individual patients and thus they depend greatly on this clinical network for success. Data related to each such clinician is collected by EMSI and maintained in the company's database. Beyond the customer contact information, information related to sales, prescribing patterns, product preferences, rankings

and comments are also maintained and employed by EMSI for its planning purposes. Thus, by all accounts, EMSI's "customers or clients," within contemplation of this restrictive covenant, are the doctors and other clinicians, and the substantial business relationships that have been developed with those doctors and clinicians are, by my consideration, legitimate business interests as contemplated by Fla. Stat. § 542.335(1)(b)(3).

EMSI also identifies eleven categories of purportedly proprietary or confidential information provided Lindsey during her employment and about or for which it claims a legitimate business interest worthy of protection.[12] EMSI also submits the Declaration of Dean Muley, EMSI's Executive Vice President of Sales, who asserts that through its SalesLogix database/software, Lindsey had extensive knowledge of EMSI's confidential business information concerning its customer base. By his account, SalesLogix is utilized as part of EMSI's confidential strategic marketing plan based on data Lindsey and others personally input on a daily basis. (Doc. 50 at 5-6). Mulley urges that the SalesLogix database contains a "blueprint for the Dallas/Fort Worth market," identifying the patterns and volume of all of the clinician customers including ranking information, subjective impressions, and key personnel at each account. *Id*. Lindsey also attended a meeting in 2010 in Florida

---

[12]EMSI identifies the following proprietary and confidential information of which Lindsey had access to while employed at EMSI and has knowledge of: (1) customer lists; (2) projected business and projected client lists; (3) the structure of customer contacts; (4) pricing options; (5) data on revenue, profitability, and volume; (6) strategic EMSI and customer intelligence; (7) customer specific issues, risks, and escalations; (8) customer and market trends; (9) customer presentations; (10) customer mapping and business unit mapping of accounts and business potential; and (11) sales pipeline reports with information relevant to multiple customers within the non-invasive medical products sector. (Doc. 18 at 11).

regarding the long-term strategy planning for EMSI. *Id.* Her claim not to have any confidential or professional information is simply untrue.

Lindsey responds to the eleven generalized categories stating that such information is not confidential and does not constitute a legitimate business interest. Regarding "customer lists," she again reiterates that such referring sources are not entitled to protection under the statute and are not confidential in any event as the identity of physical therapists, orthopedic surgeons, and pain management doctors and the like is readily available on the internet or in the telephone book. As for "projected" business or client lists, she denies ever receiving the same while employed with EMSI. She also denies knowing what Plaintiff means by "structure of customer contracts." While she had ballpark figures from EMSI's billing department, she was not involved in pricing matters and was specifically instructed to stay away from discussing pricing and billing with the referral sources. Similarly, while she had general knowledge of the number of TENS units sold, she had no information regarding revenue or profitability. She denies knowing what EMSI is referring to in its reference to "strategic EMSI and customer intelligence" or "customer specific issues and risks." While she would make customer presentations, she denies there being anything valuable or confidential about her presentations. According to Lindsey, she never received any information regarding customer and market trends, customer mapping and business unit mapping of accounts, or sales pipeline and reports. (Doc. 32 at 11-13). Zynex similarly urges that EMSI has failed to identify any "confidential" information that Lindsey knew while

employed by EMSI other than the identity of referral sources which Zynex contends are not confidential.

While the evidence produced by EMSI at this point is thin as to a number of the eleven categories of "confidential information" that it urges establishes its legitimate business interests, I conclude that, at a minimum, EMSI demonstrates that the data and tools available through its SalesLogix database/software is the type of confidential business information deserving of protection under § 542.335. This customer database, created in significant part from data input by Lindsey, identifies unique specific information regarding EMSI customers which could not be ascertained merely by looking up these doctors or clinics in a telephone book. Lindsey herself appears to acknowledge the value of this confidential information as evidenced by her emails to Zynex touting the clients and contacts she could bring with her to Zynex if hired *See* (Pl. Ex. 2, 6). The database reveals a grade ranking of the customers which EMSI states is a reflection of the volume of the business from these clients and whether it is an easy client. The printout additionally includes the type of facility, the address, telephone number, facsimile number, individual contact name, and the type of product the clinic has in its inventory. *See* (Pl. Ex. 1). As EMSI employed SalesLogix, it was also a means for collaboration and coordination of sale and marketing efforts.

I find the case of *Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415 (Fla. Dist. Ct. App. 2002), cited by EMSI, to be instructive on the issue of legitimate business interests in the circumstances here. In that case, Open Magnetic Imaging (OMI) sought injunctive relief against its former employee, Nieves-Garcia, who went to work for an OMI

competitor following her resignation despite the fact she had executed an employment agreement that contained a non-compete provision. *Open Magnetic Imaging*, 826 So. 2d at 417. In pertinent part, the appellate court rejected Nieves-Garcia's arguments that injunctive relief is properly denied because OMI failed to demonstrate that it had a legitimate business interest in a database of physicians that would potentially purchase OMI's MRI services. The evidence revealed that, "OMI's marketing representatives, including Nieves-Garcia, were trained to market OMI's services to area doctors . . . . As part of their job, marketing representatives were expected to compile a database on these physicians which contained the nature and idiosyncrasies of their practices, as well as information as to their referral patterns and preferences and which insurance they accepted." *Id.* at 419. Because the evidence supported that OMI had created the database as part of a confidential strategic marketing plan, the court found the database to be a legitimate business interest entitled to protection under § 542.335. *Id.*

Like the Nieves-Garcia defendant, Lindsey came to Electrostim with no experience in the industry selling or marketing these type medical devices. Lindsey was trained by Electrostim and given the training and support to market Electrostim's products in the Dallas/Fort Worth area. Significantly, she was marketing the TENS units to the clinicians, not patients. And despite Lindsey's claim in her declaration that she received no proprietary or confidential information, the information she would input into the SalesLogix database created a confidential or proprietary customer database with information such as the ranking of clinicians, their contact information, and their buying preferences intended to enhance the

20

marketing, sales, and service of EMSI's product.  At a minimum, the SalesLogix database as in the case of OMI, supports the finding of a legitimate business interest in the circumstances of this case.

## III.

Having found legitimate business interests, the court need consider next whether EMSI establishes: (1) a substantial likelihood of success on the merits of its claims against Defendants; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See Forsyth County v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

## A.

EMSI sues Lindsey for breach of contract.  To establish a claim for breach of contract under Florida law, a plaintiff must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).  By the proffered evidence presented, I conclude that EMSI is substantially likely to prevail on the breach of the non-compete Agreement.  Here, the evidence fairly well establishes that Lindsey breached the Agreement and continues to breach the Agreement by working with a direct competitor in the same market with the same customers both before and after leaving EMSI.  *See Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63 (Fla. Dist. Ct. App. 2010) ("Evidence that an enforceable covenant not to compete was breached will support a trial court's finding of the

likelihood of success on the merits."). As noted above, Lindsey concedes that she is calling on the same clinicians on behalf of Zynex as she did when she was with EMSI. While not essential to a breach of contract claim, it is apparent that Lindsey's leaving EMSI was accompanied by some deceit as well. At the same time that she advised EMSI that she was going to work for a bone growth company, she was negotiating with Zynex.[13] As noted above, the proffered evidence suggests that she began doing work for Zynex even before leaving EMSI. Thus, prior to leaving EMSI, she changed her voice mail to request prescriptions be sent to a non-EMSI number (Doc. 18-2 at 3) and was on Zynex's payroll. By the evidence, EMSI further demonstrates that Lindsey continues to use the contacts and information gained through her employment with EMSI to directly solicit, market, and sell to the same clients or customers in the same territory contrary to her restrictive covenant. While there is no clear evidence that she has divulged confidential information, she clearly is using the information from her work with EMSI to garner new business for Zynex, also in contravention of the restrictive covenants. As for damages caused by the breach of the Agreement, EMSI has proffered the Declaration of Bryan Wilkinson, Vice President of Sales West, who states that EMSI's business in the Dallas/Fort Worth market has decreased 50% to 90% since Lindsey left EMSI to work for Zynex. (Doc. 18-2 at 4).

As for EMSI's claim against Zynex, I conclude that EMSI is substantially likely to prevail on the claim of tortious interference as well. In order to state a cause of action for

---

[13]For a while after she left, the deceit continued. It was discovered only after an EMSI regional manager made an anonymous call to a client and was referred to Lindsey with Zynex and when a prescription form from a former customer was inadvertently faxed to EMSI but intended for Lindsey at Zynex. (Doc. 18-2 at 4, 9).

tortious interference under Texas law, EMSI must plead and prove the existence of a contract subject to interference, a willful and intentional act of interference with the contract, that proximately caused its injury, and that it suffered actual damage or loss. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77-78 (Tex. 2000). Application of Florida law involves a similar analysis. Thus, to state a claim for tortious interference with a business relationship under Florida law, a plaintiff must plead: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship. *Tamiami Trail Tours, Inc. v. Cotton,* 463 So. 2d 1126, 1127 (Fla. 1985).

Here, the proffered evidence reveals that Zynex was well-aware of Lindsey's employment and contractual relationship with EMSI when it began negotiations with her, even acknowledging she was a "rock star" with EMSI. (Pl. Ex. 2). Zynex was also fully aware of her non-compete agreement during the negotiation process, and yet it offered her a $5,000 signing bonus, and an indemnification agreement to insulate her from loss because of the same to induce her to join Zynex as soon as possible. (Pl. Ex. 3). By the indemnification agreement, Zynex expressly acknowledged the Agreement between Lindsey and EMSI and the restrictive covenants contained therein. In consideration for Lindsey coming to work for Zynex, Zynex agreed to assume her defense in the event she is sued by EMSI over the terms of the Agreement, and indemnify her from any and all expenses, fees, damages, judgments, and amounts incurred by her in connection with the action. (Pl. Ex. 5). By my consideration,

the proffered evidence supports a finding of an intentional interference with the Agreement between EMSI and Lindsey.  As set forth, EMSI has offered evidence of business lost in the Dallas/Fort Worth market as a result of Lindsey going to work with Zynex.  Thus, I am compelled to conclude that EMSI is substantially likely to prevail on its claim of tortious interference against Zynex.  *See Cont'l Grp. v. KW Prop. Mgmt.*, 622 F. Supp. 2d 1357 (S.D. Fla. 2009) (entering injunction against new employer where new employer caused employee to breach non-compete agreement).

The court next considers whether a substantial threat of irreparable injury is likely to occur if an injunction is not granted.  On the issue of irreparable harm, under Florida law, the "violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."  Fla. Stat. § 542.335(j).  Additionally, EMSI argues that the loss of customers and good will works an irreparable injury that is difficult to measure monetarily such that injunctive relief is appropriate.[14]  Here, the evidence reflects the actual loss of customers, and by my consideration, likely confusion in the marketplace and harm to EMSI's goodwill in the circumstances.  Defendants offer nothing to overcome the presumption of irreparable injury, and thus EMSI satisfies this element of the four-part analysis for injunctive relief.

As for the balancing of harms, while there is undoubtedly some immediate harm to Lindsey in enforcement of the restrictive covenants and to Zynex as well for any resultant disruption to its sales efforts, it is harm of their own making.  And, I agree with EMSI that

---

[14]Plaintiff cites *International Hair & Beauty Systems, LLC v. Simply Organic*, 8:11-cv-1883-T-30AEP, 2011 WL 5359264, at *9 (M.D. Fla. Sept. 26, 2011).

reasonable enforcement of the restrictive covenants would not pose an undue hardship on Defendants. As now proposed, Lindsey will be free to work for Zynex anywhere other than the Dallas/Fort Worth market and Zynex is free to employ others to work in that market if it chooses. In these circumstances, the balance of harm favors entry of a preliminary injunction.

As for the public interest, both Florida and Texas have an interest in upholding contracts and avoiding unnecessary and inappropriate interference with business relationships. By my consideration, a preliminary injunction properly tailored to protect the legitimate business interests at issue is not at all adverse to the public interests of either state.

### B.

Defendants argue that EMSI is not entitled to injunctive relief because it has "unclean hands." In support Defendants submit documents from the FDA[15] and a Declaration from Lindsey. (Def. Ex. 2, Doc. 69). The letter references an inspection at EMSI on February 22, 2010. The upshot of the inspection was that EMSI was purportedly marketing certain TENS products without marketing clearance and promoting uses of the products for which there was no clearance. *Id.* Lindsey complains that she was never advised during her work at EMSI that she was promoting EMSI TENS units for unapproved treatments.

In this Circuit, "[f]or a defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that

---

[15]Two versions of the Warning Letter have been filed under seal. The first is a copy obtained by Defendants from the internet and the second version is from EMSI's files. For obvious reasons, the internet version need not be kept under seal and will be made a part of the exhibits to the hearing as Defendants' Ex. 3. For the time being, the other version and accompanying correspondence shall remain under seal at (Doc. S-1).

the plaintiff's wrongdoing is directly related to the claim against which it is asserted. . . .

Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the

defendant can show that it was personally injured by [the] conduct." *Calloway v. Partners*

*Nat'l Health Plans,* 986 F.2d 446, 450–51 (11th Cir. 1993) (internal citations omitted). As for

the first requirement, the plaintiff's misconduct must be "directly related to the merits of the

controversy between the parties." *Mitchell Bros. Film Grp. v. Cinema Adult Theater,* 604

F.2d 852, 863 (5th Cir. 1979).[16] Here, Defendants, at present, fail on both prongs. First, the

existence of the FDA Warning Letter did not surface until after the initiation of this suit and

appears wholly unrelated to Lindsey's alleged breach of the non-compete provisions of the

Agreement. Similarly, the substance of the FDA letter has no relationship at all to the

Plaintiff's tortious interference claim. Even if the first prong could be met, neither Defendant

demonstrates personal harm by EMSI's conduct. In light of the applicable standard, I find

Defendants' assertion of the "unclean hands" defense is no bar to the entry of injunctive relief.

Defendants also argue that the overbreadth of the restrictive covenants– that Lindsey

would be precluded from engaging in any similar employment in the entire country– makes

the covenants unenforceable. Defendants are incorrect that such necessarily invalidates the

entire Agreement. Rather, the court may properly narrow the scope of the injunction so as to

"grant only the relief reasonably necessary to protect such interest or interests." *See* Fla. Stat.

§ 542.335(1)(c). In any event, by its motion and arguments, EMSI requests the non-compete

---

[16]In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

be applied against Lindsey as to the Dallas/Fort Worth market only. In light of that being Lindsey's former territory with EMSI, that appears to define the appropriate geographic area. As for the two-year provision, while such is rather onerous, it is not necessarily unreasonable under Florida law and in any event, need not be addressed on this motion for preliminary injunctive relief.

IV.

For the foregoing reasons, I recommend that Plaintiff Electrostim Medical Services, Inc.'s Motion for Preliminary Injunction and Supporting Memorandum of Law (Doc. 18) be **granted** and a preliminary injunction entered pending further order of the court on the following terms:

1) Dawn Lindsey shall be enjoined from engaging in directly or indirectly or assisting others in engaging in a business or endeavor of the same nature and kind as that of EMSI in the Dallas/Fort Worth market pending final order of the court. In no event shall the injunction extend beyond two years from the entry of the preliminary injunction;

2) Zynex shall be enjoined from employing Dawn Lindsey in any business or endeavor of the same nature and kind as that of EMSI in the Dallas/Fort Worth market pending final order of the court. In no event shall the injunction extend beyond two years from the entry of the preliminary injunction;

3) Dawn Lindsey and all other persons or entities in active concert or participation with her, including Zynex shall be enjoined from using and divulging Plaintiff's confidential and proprietary business information including matters within its SalesLogix database, and all

such matters presently in the possession, custody or control of Lindsey or any persons or entities, including Zynex, with whom she has shared such matters, if any, shall be immediately returned to EMSI; and

4) Such provisions shall take full force and effect upon EMSI posting a bond in the amount of $25,000.00.

Respectfully submitted on this
13th day of March 2012.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.

Copies to:
Honorable Virginia M. Hernandez Covington, United States District Judge
Counsel of Record